Filed 9/5/25  P. v. Nolazco-Loza CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B336405 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. XEAKA112745-01 |
| v. | |
| ANTHONY NOLAZCO-LOZA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Victor D. Martinez, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Anthony Nolazco-Loza pleaded no contest to one count of attempted murder and admitted a gang enhancement allegation. The court sentenced him to a term of 15 years to life. Several years later, Nolazco-Loza filed a petition for resentencing under Penal Code section 1172.6.[1] At an evidentiary hearing, the People presented evidence showing Nolazco-Loza drove a truck while his passenger Vicente Palomares fired a high-powered rifle at a car full of people. Nolazco-Loza and Palomares fled the scene and led the police on a high-speed chase covering more than 14 miles. The court denied Nolazco-Loza's petition, finding beyond a reasonable doubt he committed attempted murder as a direct aider and abettor.

On appeal, Nolazco-Loza challenges the sufficiency of the evidence supporting the court's order. He contends there is not substantial evidence that he knew of and shared the shooter's intent to kill. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

1. ***The charges and plea***

In November 2016, the People charged Nolazco-Loza with four counts of attempted murder (§§ 187, 664), driving recklessly while fleeing a police officer (Veh. Code, § 2800.2), and shooting at an occupied motor vehicle (§ 246). The People alleged various gang and firearm enhancements.

---

[1] Statutory references are to the Penal Code. Nolazco-Loza filed the petition under former section 1170.95. Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) (*People v. Strong* (2022) 13 Cal.5th 698, 708, fn. 2 (*Strong*).) For the sake of simplicity, we refer only to section 1172.6.

A year later—in November 2017—Nolazco-Loza pleaded no contest to a single count of attempted murder. He admitted the gang enhancement allegation and that the crime was committed willfully, deliberately, and with premeditation. The court accepted the plea, dismissed the remaining counts, and sentenced Nolazco-Loza to a term of 15 years to life.

## 2. *The resentencing petitions*

In January 2022, Nolazco-Loza filed a petition for resentencing under section 1172.6. The People conceded Nolazco-Loza could have been convicted of attempted murder under the natural and probable consequences doctrine, and therefore had made a prima facie showing. However, the People asserted they could demonstrate beyond a reasonable doubt he is guilty of attempted murder as a direct aider and abettor.

Palomares—who had also pleaded no contest to a single count of attempted murder—filed a petition for resentencing under section 1172.6 a year after Nolazco-Loza filed his petition.

## 3. *The People's evidence*

The court conducted a joint evidentiary hearing on Nolazco-Loza's and Palomares's petitions over the course of two days in November 2023 and January 2024. The People submitted 14 exhibits and called eight witnesses to testify at the hearing. The court also considered the transcript of the preliminary hearing, but clarified it would disregard hearsay testimony introduced under section 872.[2]

---

[2] Some witnesses testified at both the preliminary hearing and the section 1172.6 evidentiary hearing. For the sake of simplicity, we summarize the evidence together.

A.M.[3] testified a shooting occurred in the early morning hours of June 5, 2016, near the intersection of Ramona Boulevard and Bogart Avenue in Baldwin Park. At the time, A.M. was a passenger in a car with three men—Andrew Cordia, Robert Alfaro, and Sergio Ortiz. A vehicle pulled up next to them as they were stopped at a red light. A.M. was sure the other vehicle was a car, not a truck.

A.M. said there were three or four men with shaved heads in the other car, and she described them as "kind of cholo-type guys." Someone in the other car said something about " 'Baldwin Park' " and then asked, " 'where you from?' " A.M. heard continuous gunshots, likely more than 10. Everyone in A.M.'s car was struck by bullets, except A.M.

Police officer Alexis Rodriguez testified he was driving a patrol car along Ramona Boulevard in Baldwin Park the morning of the shooting. At 1:44 a.m., he noticed a pickup truck traveling in the opposite direction at a high rate of speed. Nolazco-Loza was driving, and Palomares was in the passenger seat. Palomares had his torso and head outside the passenger-side window. He was holding a dark object that looked like a stick.

Rodriguez noticed a sedan driving close to Nolazco-Loza's truck. The sedan and truck were going the same speed in the same direction, and Rodriguez described them as traveling "in tandem." Rodriguez made a U-turn and started following the vehicles. As he got closer, the sedan turned down another street.

---

[3]    Because A.M. was a minor when she testified, we refer to her using her initials. (See Cal. Rules of Court, rule 8.90(b).)

4

Rodriguez turned on his lights and sirens and continued following the truck.  Nolazco-Loza accelerated to 80 miles per hour and ran a number of red lights and stop signs.  About eight to 10 minutes into the pursuit, Nolazco-Loza turned off the truck's front and rear lights.  Rodriguez followed the truck for 14 miles—including down Merced Avenue—before police helicopters took over.

Maricela Rojas testified she was standing in the front yard of her home on Merced Avenue in the early morning of June 5, 2016.  Rojas heard police sirens and a helicopter.  A dark pickup truck drove past her, and someone in the truck threw a long, stick-like object from it.  She told police the object appeared to be a rifle.  Police later found in the area a working high-powered SKS rifle.  In another location along the path of the chase, officers found a high-capacity SKS rifle magazine and rifle bullets.

The chase eventually ended, and the police arrested Nolazco-Loza and Palomares.  Inside the truck, officers found an intact rifle bullet, a New York Yankee's hat, and black gloves.

At the intersection where the victims were shot, police found shell casings and bullet fragments fired by the SKS rifle.  The rifle bullets were the same make, caliber, and material as the bullet found in Nolazco-Loza's truck.  Police also found three shell casings that had been fired by a handgun.

Officers found a rifle bullet in a Domino's Pizza parking lot about 200 yards from the intersection.  They also discovered bullet holes in a car parked in the lot.

Testing revealed gun powder residue (GSR) on samples taken from Palomares's hands, the gloves found in the truck,

5

and the truck itself.  Samples taken from Nolazco-Loza's hands did not contain GSR.

Detective Norman Gonzalez interrogated Nolazco-Loza after his arrest.  Gonzalez read Nolazco-Loza his rights under *Miranda*,[4] which Nolazco-Loza apparently waived.[5]

Nolazco-Loza admitted he was driving the truck, stating, " 'That's all I'm saying[,] I was driving.' "  Gonzalez told Nolazco-Loza the victims were injured by gunshots coming from his truck. Gonzalez said he did not think Nolazco-Loza "acted of his own volition," and he "just wanted to understand why someone like [Nolazco-Loza] would be in this position."  Nolazco-Loza replied, " 'I put myself in this position.' "  He explained he drove from his grandparents' house to a friend's house, but he declined to reveal the friend's name.  Asked to describe the sequence of events, Nolazco-Loza said, "whatever happened after that happened."

Gonzalez said he believed the bulk of the blame for the shooting was beyond Nolazco-Loza's control, and he urged Nolazco-Loza not to take the blame for another person's actions. Gonzalez again asked what happened, and Nolazco-Loza said, " 'I was just trying to figure out where to go, trying to think where to go.' "  Gonzalez asked Nolazco-Loza if Palomares told him to keep driving, to stop, or to let him out of the truck. Nolazco-Loza replied, " 'No, it was my choice.' "  Asked why he

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[5]     At the preliminary hearing, Nolazco-Loza moved to exclude under *Miranda* some of the statements he made to Gonzalez. The court denied the motion, explaining Nolazco-Loza had not unambiguously invoked his right to remain silent.  Nolazco-Loza does not challenge that ruling on appeal.

did not stop, Nolazco-Loza answered, " 'I just chose not to stop.' " Gonzalez asked what happened before the officer tried to stop him.  Nolazco-Loza replied, " 'Whatever happened, whatever you guys think happened.  I don't have anything else to say.' "

Nolazco-Loza acknowledged he knew Palomares "somewhat" and described the two as "associates."  Nolazco-Loza said he and Palomares drank alcohol and used drugs together.

Later that day, Gonzalez collected a buccal sample from Nolazco-Loza.  Gonzalez asked Nolazco-Loza when he had last been around someone who fired a gun.  Nolazco-Loza responded, " 'what happened when I was driving.' "  Asked what he meant, Nolazco-Loza said, " 'the thing I was arrested for.' "

Jason Adams testified as a gang expert for the prosecution and opined the shootings were to benefit a criminal street gang.  According to Adams, Palomares is a member of a gang in Baldwin Park called the Northside Bolen Parque (Northside Bolen), which is sometimes referred to as Northside Baldwin Park.  The gang's territory includes the area of Baldwin Park north of Ramona Boulevard.  Northside Bolen gang members wear clothing featuring the letter "N," such as the logo for the New York Yankees.  Palomares had several Northside Bolen tattoos, regularly associated with members of Northside Bolen, and wore clothing associated with the gang.

Adams did not know whether Nolazco-Loza was a member of Northside Bolen.  Adams thought he could have been a new member of the gang or an associate "striving . . . to become a member of Northside Bolen."  During a search of Nolazco-Loza's family home—which was on the same street as Palomares's family home—officers found a journal with "NSBP" written on it, which stands for Northside Baldwin Park.

Nolazco-Loza had a tattoo on his right hand of the word "Vicente" surrounded by the phrase "right hand man."[6] Vicente is Palomares's first name.

Adams testified the three male victims were members of a graffiti "tagging crew" in Baldwin Park known as CWA. He explained CWA is "more than just a tagging crew," and its members had committed violent crimes. Adams characterized CWA members as "tag bangers," presumably a portmanteau of "taggers" and "gang bangers."

Adams testified Northside Bolen and CWA had a rivalry, although he would not classify it as a "war." Adams described CWA as a "feeder" for gangs that rival Northside Bolen. He said CWA members would sometimes "tag" inside Northside Bolen territory, which was disrespectful to the gang.

4. *The court's order*

The court found Palomares committed an attempted murder and acted with malice. The court noted it "certainly ha[d] a tougher struggle" to determine whether Nolazco-Loza acted with malice. It ultimately found—beyond a reasonable doubt—Nolazco-Loza had the intent to kill when he "assisted the shooter in the shooting itself by pulling up next to the vehicle with an individual with an assault rifle and allowing the shooting to occur and then fleeing that location." The court concluded Nolazco-Loza is guilty of attempted murder as a direct aider and abettor, and it denied his petition on that ground.

Nolazco-Loza timely appealed.

_____

[6] The record does not reflect when Nolazco-Loza got the tattoo. However, the parties seem to agree it was sometime after his arrest but before he pleaded no contest.

## DISCUSSION

**1.** *Section 1172.6*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) took effect on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) The bill amended existing law on accomplice liability for murder " 'to ensure that murder liability is not imposed on a person who is not the actual killer . . . .' " (*People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 417, quoting Stats. 2018, ch. 1015, § 1(f); see § 189, subd. (e)(1).) To accomplish this goal, Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure a person's sentence is commensurate with his individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971 (*Lewis*).)

Senate Bill 1437 also authorized, through new section 1172.6, an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he could not have been convicted of murder because of Senate Bill 1437's changes to the definition of the crime. (See *Lewis, supra*, 11 Cal.5th at pp. 959–960; *Gentile, supra*, 10 Cal.5th at p. 843.)

Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), effective as of January 1, 2022, amended section 1172.6 in various respects. As relevant here, the bill clarified that "persons who were convicted of attempted murder . . . under . . . the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theor[y]." (Stats. 2021, ch. 551, § 1(a).)

9

Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an evidentiary hearing at which it is the prosecution's burden to prove beyond a reasonable doubt the petitioner is ineligible for resentencing. (*Strong, supra*, 13 Cal.5th at pp. 708–709; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) If the superior court finds beyond a reasonable doubt the petitioner is guilty of murder or attempted murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6. (*Strong*, at pp. 708–709; *Vargas*, at p. 951.)

Senate Bill 775 clarified that the burden of proof at a section 1172.6 hearing is beyond a reasonable doubt. (§ 1172.6, subd. (d)(3).) The bill also clarified the standards for the admissibility of evidence at the evidentiary hearing. Section 1172.6, subdivision (d)(3) now provides, "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

On appeal from a trial court's denial of relief under section 1172.6 following an evidentiary hearing, we review the trial court's findings for substantial evidence. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 747.) We examine the entire record in the light most favorable to the order to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support

a rational trier of fact in finding the defendant guilty beyond a reasonable doubt. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; *People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658; *People v. Westerfield* (2019) 6 Cal.5th 632, 713.) We resolve all evidentiary conflicts and questions of credibility in favor of the order. (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226–227.) We do not reweigh the evidence or reassess witness credibility. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact].)

**2.** ***Substantial evidence supports the trial court's order***

Nolazco-Loza contends the trial court erred in denying his petition because there is insufficient evidence from which the court could have found him guilty of attempted murder under a direct aiding and abetting theory.

" 'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' [Citations.] Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117 (*McCoy*).) "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

11

Attempted murder requires a "specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*).) "An intent to kill is the equivalent of express malice, at least when there is no question of justification or excuse, and by finding appellant guilty of attempted murder, the jury necessarily found he had personally harbored intent to kill or express malice." (*People v. Coley* (2022) 77 Cal.App.5th 539, 547–548.)

The requirement of a specific intent to kill applies equally to a defendant accused of attempted murder as a direct aider and abettor. (See *McCoy, supra*, 25 Cal.4th at p. 1118; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) "[T]o be guilty of attempted murder as [a direct] aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Lee, supra*, 31 Cal.4th at p. 624.) To determine whether a defendant is guilty of attempted murder as a direct aider and abettor, a court may consider factors such as the defendant's " 'presence at the scene of the crime, companionship [with the direct perpetrator], and conduct before and after the offense.' " (*Nguyen*, at p. 1054.)

Here, substantial evidence supports the trial court's determination that Nolazco-Loza is guilty of attempted murder as a direct aider and abettor. As Nolazco-Loza seems to concede, the People presented ample evidence showing he drove a truck relatively close to a car stopped at a traffic light. Nolazco-Loza's passenger, Palomares, fired shots in the direction of the car using

12

a high-powered rifle. Three of the car's four passengers were injured.

The record also contains evidence showing Palomares's motivation for the shooting was gang-related. The People's gang expert testified Palomares belonged to the Bolen Parque gang—also known as Baldwin Park—and some of the victims were members of a rival tagging crew known as CWA. The shooting took place in Bolen Parque territory. According to one of the victims, immediately before the shooting, someone yelled " 'Baldwin Park' " and made a gang-related provocation, asking " 'where you from?' "

On this record, the trial court reasonably could have concluded Palomares fired the shots at the victims' car with the intent to kill everyone inside it. The court also reasonably could have found Nolazco-Loza aided Palomares in carrying out the attack. Nolazco-Loza does not argue otherwise.

Nevertheless, Nolazco-Loza contends the trial court erred because there is insufficient evidence showing he possessed the requisite intent when he assisted Palomares. Specifically, Nolazco-Loza argues there is not substantial evidence that he knew of and shared Palomares's intent to kill. According to Nolazco-Loza, the People presented no affirmative evidence of his intent, so the court must have relied on conjecture to find him guilty under current law.

"Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) Here, Nolazco-Loza's intent can be inferred, in part, from the circumstances of the shooting. The police found casings fired from at least two different firearms

13

at the intersection where the victims were shot, suggesting Palomares was not the only shooter.  It is reasonable to infer the other shooter was in the car A.M. reported seeing immediately before the shooting.  According to A.M., one of the men in the car yelled the name of the gang to which Palomares belonged, indicating they were working with him.  This is consistent with Officer Rodriguez's report that a sedan was driving "in tandem" with Nolazco-Loza's truck shortly after the shooting.  That there were multiple shooters in separate vehicles suggests the attack was planned and coordinated, rather than a spur-of-the-moment crime.

There is also evidence from which the court reasonably could have found Nolazco-Loza was aware of the plan and willingly participated in it.  Because the victims were in another vehicle, Nolazco-Loza's role as the driver was essential to the execution of the attack, making it more likely he was aware of it ahead of time.  That inference finds support in evidence showing Palomares shot the victims with an SKS rifle.  Given the size of the firearm, it is reasonable to infer Nolazco-Loza knew Palomares was armed as soon as he got into the truck.  Despite that knowledge, the ballistics evidence indicates Nolazco-Loza drove the truck relatively close to the victim's car.  By doing so, he allowed Palomares to shoot the victims from close range, increasing the likelihood they would be killed.  This suggests Nolazco-Loza knew of and shared Palomares's intent to kill.

Nolazco-Loza's conduct after the shooting sheds further light on his intent.  Nolazco-Loza and Palomares fled the scene of the crime together.  When a police officer tried to stop them, Nolazco-Loza led the officer on a 14-mile high-speed chase.  The prolonged pursuit allowed Palomares to throw the rifle and clip

14

out of the truck at different locations, making it more difficult for the police to find them.  The court reasonably could have found Nolazco-Loza's actions reflect a consciousness of guilt. (See *People v. Williams* (2013) 56 Cal.4th 630, 679 ["evidence of defendant's flight after the crimes were committed supports an inference of consciousness of guilt and constitutes an implied admission"]; *People v. Rogers* (2009) 46 Cal.4th 1136, 1170 [a defendant's attempt to suppress evidence may show a consciousness of guilt].)  That Nolazco-Loza took such significant risks while fleeing—turning off the truck's lights, running red lights and stop signs, and driving at speeds up to 80 miles per hour—indicates he knew he had committed a particularly serious crime.  (See *People v. Mason* (1991) 52 Cal.3d 909, 941– 942 [evidence that defendant engaged in a high-speed automobile chase with sheriff's deputies showed consciousness of guilt for murder].)

Nolazco-Loza's statements after his arrest also support an inference that he knew of and shared Palomares's intent to kill.  Despite invitations from the interrogating officer, Nolazco-Loza declined to place any blame on Palomares, either for the shooting or the resulting chase.  Instead, Nolazco-Loza insisted he " 'put [him]self in this position,' " "[w]hatever happened . . . happened," and it was " '[his] choice' " to flee from the police. Nolazco-Loza also admitted he and Palomares had socialized in the past, and he referred to them as "associates."  Consistent with that characterization, Nolazco-Loza had a tattoo of Palomares's first name together with the phrase "right hand man," suggesting Nolazco-Loza viewed himself as providing support and assistance to Palomares.

15

Viewing this evidence in the light most favorable to the order, the court reasonably could have found Nolazco-Loza knew of and shared Palomares's intent to kill.  The record contains substantial evidence from which the court reasonably could have found, beyond a reasonable doubt, Nolazco-Loza committed attempted murder under a direct aiding and abetting theory.  Accordingly, the court did not err in denying Nolazco-Loza's petition for resentencing.

We reject Nolazco-Loza's brief contention that the court failed to consider his youth at the time of the shooting—18 years old—when determining whether he is entitled to resentencing.  The cases on which Nolazco-Loza relies involved convictions for felony murder and implied malice murder.  (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–417 (*Pittman*); *People v. Jimenez* (2024) 103 Cal.App.5th 994; *People v. Jones* (2022) 86 Cal.App.5th 1076 (*Jones*); *People v. Oliver* (2023) 90 Cal.App.5th 466, 489 (*Oliver*); *In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*).)  The courts in those cases held a defendant's youth is relevant to whether he acted with "reckless indifference to human life" or "conscious disregard for human life," which are elements of felony murder and implied malice murder, respectively.  (See *Pittman*, at p. 417.)  Here, the trial court concluded Nolazco-Loza is guilty of attempted murder under a direct aiding and abetting theory, which required the court to find he knew of and shared the shooter's intent to kill.  The court did not need to find he acted with "reckless indifference to human life" or "conscious disregard for human life."

Nolazco-Loza contends this distinction is immaterial.  He argues the courts' reasoning in cases involving felony murder and implied malice murder applies equally to cases where the

16

petitioner allegedly acted with an intent to kill. Nolazco-Loza suggests youth is part of the "totality of the circumstances" relevant to determining a petitioner's intent, regardless of what specific intent the crime requires.

Assuming that were true, we still would reject Nolazco-Loza's argument. The evidentiary hearing in this case began in November 2023. By that time, at least nine courts had stated an accused murderer's youth is relevant to his mental state. (See *People v. Harris* (2021) 60 Cal.App.5th 939, 960; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 986–987; *Moore, supra*, 68 Cal.App.5th at p. 454; *People v. Keel* (2022) 84 Cal.App.5th 546, 558–559; *Jones, supra*, 86 Cal.App.5th at p. 1079; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595; *In re Harper* (2022) 76 Cal.App.5th 450, 470; *Oliver, supra*, 90 Cal.App.5th at p. 489; *Pittman, supra*, 96 Cal.App.5th at p. 416.) The record shows defense counsel and the court were aware of Nolazco-Loza's youth and its potential relevance, as evidenced by their discussion, at the close of the hearing, of a *Franklin*[7] motion Nolazco-Loza filed in July 2021. Despite this, Nolazco-Loza did not ask the trial court to consider his youth, argue its relevance, or object that the court failed to consider it. His failure to do so forfeited the issue on appeal. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 653 [defendant "forfeited this claim by failing to raise this issue below, when the trial court could have remedied the alleged shortcoming"]; *Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 670 [" 'It is axiomatic that arguments not raised in the trial court are forfeited on appeal.' "].)

---

[7]     *People v. Franklin* (2016) 63 Cal.4th 261.

## DISPOSITION

We affirm the order.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.